Good morning, your honors. George Ritos, may it please the court on behalf of the appellant Brad Van Patten. And if you could keep your voice up, I would appreciate it. Absolutely, I apologize. No, no, no apology necessary. I'd like to reserve two minutes to address any arguments raised by Appellee's counsel. Okay. Thank you. The District Court's granting of the motions for summary adjudication against the plaintiff, Mr. Van Patten, was an error because essentially the District Court took all the inferences and the evidence that was cited, demonstrating a material fact, and looked at it in the light most favorable to the moving party rather than the non-moving party. For that reason, we believe the order was an error. One of the main issues, obviously, is the fact specific to this case. And it's our opinion that the District Court and the appellees took a truncated view as to the facts of a TCPA case, namely the issue of prior express consent. And prior express consent and all the cases cited by the appellees as well as the District Court do not look at the specific facts related to this case, Mr. Van Patten and the class. The Chesbrough case versus Best Buy talks about how each TCPA case needs to be looked at with a sense of Well, the facts are Mr. Van Patten signed up for a gym membership in March of 2009. There's some dispute as to whether he provided the phone number to the — on the application or on a prequalification card. But there's no dispute that the phone number appeared on the application. He then canceled it within the three-day grace period. Canceled it, meaning canceled the membership. Canceled the membership, ended his relationship, and the application — Well, ended his relationship, that's a tricky question. He canceled his membership. Correct. And it's certainly our — my position that the revocation of the contract ended his relationship with Gold's Gym. I understand that's your legal argument, but so far we're just talking about facts. Correct. He cancels the contract, and then the application only identifies Gold's Gym as the member to which he's joining, and it's located in Green Bay. There's no reference to Vertical Fitness. And in fact, the record shows that the was owned by Fox River. And the testimony of Mr. Barden in the record reflects that Fox River owned that gym, while Vertical Fitness did not. Fast forward three years, the facts show that in May and June of 2012, Vertical Fitness, a different entity wanting to create a different concept of a gym, specifically de-branding from Gold's Gym, sends out a text message to approximately 80,000 members of the class. And is it the same physical gym? No. That Green Bay gym, according to the websites which are included in the record, no longer existed. It's a different gym. Does the TCPA, the Telephone Consumer Protection Act, forbid any assignment, say, of these contracts or permissions to get text messages or what have you, to some succeeding firm or some successor firm? The only context to which I've seen that in is in the context of a debt collection, where the cases and the TCPA creates a carve-out whereby if an entity to which you owe money to assigns that over to a debt collector, the debt collector is then permitted to contact them. In this context, there's no debt. There's no attempt to collect money. So the contract doesn't specify Gold Gym or its successor interests? There's nothing in the contract that I'm aware of, and there was no arguments put forth by the appellees in the motion for summary judgment or in the appeal addressing that issue. So let me make sure. I'm still working on facts here. Absolutely. So we're working with a successor company. I would say no, Your Honor. We don't know if it's a successor company. All we know it's Vertical Fitness sending out text messages. Vertical Fitness did not own the Gold Gym in Green Bay. Fox River did. And do we know the relationship between Vertical Fitness and Fox River? We do not. We know that there's some ownership interest by Mr. Barden, who is the CEO of Vertical Fitness, of Fox River, but there's no indication as to what, at what point he took ownership. The testimonies of Mr. Barden suggest that Fox River owned that gym at that time, and Vertical Fitness is the defendant that authorized the text messages. Yeah, what looks to me as though through some different layers, and I'm trying to get my hands around what these layers are as best we can figure it out from the record, they find a prior customer list or prior membership list, and they say, hey, please come back to the gym, but now gym in a large generic sense. Come back to this company because you were previously a customer of Gold's Gym that has some, maybe attenuated, but some relationship to the current solicitation. Is that an inaccurate statement of the facts? That's essentially what the appellees are contending. Obviously, my position is, and the record doesn't reflect this, what that relationship is, is unknown and not argued at the lower level, except for the fact that Fox River owned that gym, and Fox River is not the entity to which authorized the text message. And so in the context of the standard for a motion for summary adjudication, if you're taking those inferences in the light most favorable to the class and Mr. Van Penn, then. And what exactly did the text message say? The first one said that we're going to, we'd like you to join the new gym, identify as experienced fitness, new concept, and there's a lot of testimony talking about how we were looking, they were looking for specifically to avoid any reference to Gold's Gym and wanting to identify with a new concept. And then the second text message is a sweet state to obtain a Nissan. And neither one gave any type of opt out or unsubscribe? No, Your Honor. So, back to the facts, Your Honor. He identifies, he then cancels the membership, the two texts come out three years later, by a different name, different legal entity. We don't know that relationship, certainly it wasn't argued at that level. The only facts in the record show that Fox River owned it. And then we talk about the district court's rulings based upon those facts. And the district court, along with the appellee, really focuses on several cases regarding, well, you gave your phone number, so you must have consented, and there's no evidence of revocation. Is any per se finding or requirement under the statute that the failure to give the opt out or unsubscribe feature in a text or email soliciting membership or what have you in these communication devices lead to a per se violation of the statute? Is there anything interpreting that in case law or even from the statute itself? There are case laws that address that, but I don't believe it's been codified or identified by the FCC as a mandate. But it's one of the factors that the cases seem to suggest is a recommended course to avoid the liability. But all the cases cited by the district court and the appellee's focus on there was no cancellation, and all of them addressed that somebody gave the phone number and then ultimately was contacted by that very same entity. Whether it was the Murphy versus DIC biological case where there's a ten year gap between the relationship with the blood donor case, the facts were still that the blood donor gave the phone number to the blood bank, and the blood bank at some point, regardless of the time frame, contacted him back. Here we have, again, a different entity, and there's no evidence at any point in any of those cases of anyone affirmatively canceling. And the case cited within the Emanuel case, which was supported by the district court, talks about the Gutierrez case. And the Gutierrez case suggests that you can give consent and you can revoke it in the same means by which you provided the consent. So here, if Mr. Van Patten revoked the very contract to which arguably provided consent to a Gold's Gym in Green Bay, cancelling that contract should have sufficed as revoking that consent. Other than perhaps the solicitation for a lottery or whatever in the second text, the first text, wouldn't that be considered normal business communication? It would be a normal business communication, Your Honor, had the same gym contacted him. I don't think it's normal business for a new entity trying to promote and may have some ownership interest in other LLCs. Attempting to de-brand is the equivalent to a normal business relationship. If I could then turn to the issues about the district court's findings that there were no contacts or business in California. I think that, again, the district court unfortunately took a favorable view to the inferences in favor of the appellees. One example of that is the text blast contained at least 175 individuals that either had a California address or a California phone number. And the district court's analysis was, well, they may have had that information, but we don't know where they live. But there was no evidence in the record or inference to be drawn that they lived anywhere else but California. So that, coupled with the Vertical Fitness's promotional press release that said, we're going to take this brand nationally, they hired a California company, Advacore, located in San Diego to perform the text blasting. It included at least 175 individuals. And the fact that Mr. Van Padden moved there certainly subjects Vertical Fitness to the California jurisdiction. And where was your client at the time that he received the messages? San Diego. He had moved to San Diego shortly after canceling the gym membership. Was there anything in the area code of his phone number that would have suggested he was in California? No, your honor. And then the analysis as to the fact that he wasn't charged for the phone call seemed to be another point the district court was making as a grounds to justify the denial or the granting of the motion for summary adjudication. The case law is overwhelmingly in favor of the fact that whether or not you're charged for the call is irrelevant under the TCPA. And there's a series of cases, whether it be the Moore case, the Mano case, the Gutierrez case, all say that the charge for the call doesn't matter. And the district court, again, ignoring one piece of evidence, we submitted from a telecommunications expert, Randall Schneider, that's in the record, specifically indicated that whether or not you have an unlimited plan or a series of minutes, the fact that you're getting text messages factors into the cost of your plan and the ever increasing nature of that plan. So it's a damaging fact. And those cases say that that's not even required. So that particular piece of evidence wasn't identified at all in the district court's order. I don't have anything else unless you- Okay, went away from the other side and then you'll have some time to respond. Thank you very much. Good morning, Your Honors. Mark Ellis on behalf of Vertical Fitness, the apology, one of the apologies. And we've agreed to split time with AdvoCorp, the second apology. I'll have eight minutes. It will have seven. Your Honors, first of all, are there any specific questions I can answer for you? I have a- Go ahead, please, Judge Gould. Now, the question I have in my mind, good morning, is when the statute talks about prior express consent. Prior express consent in the TCPA, and somebody gives their phone number, is that a consent to a call for all purposes? Or is that a consent for a call for some but not necessarily promotional purposes? So I think that the case law is split on that. Some cases say that when you provide consent, when you provide the number, you are providing it for all purposes. Other cases say that when you provide consent, it does, it can be circumscribed. The 1992 TCPA order, which is the order that everyone, all the cases seem to rely upon, including this court in its unpublished decision in Baird, which is in the federal appendix, says, you can provide consent when you provide your phone number, and you can include any restrictions at that point in time. I don't want to chicken walk too much from your question, Your Honor, but it is that language that you can restrict when you provide your number, what it can be used for, that leads certain federal court cases, courts across the nation to say, there is no such thing as revocation. You have to make your restrictions at the time that you provide the number, and therefore, the courts infer that you can't have revocation later. We're not taking that position in this case, but I'm sorry, I probably over-answered your question. I apologize. I think you answered it, thank you. I'd like to follow up on Judge Gould's question, because it's pretty clear to me that we don't have express consent as express is ordinarily understood in the English language. Giving the phone number is giving the phone number. If I were to expressly consent to be called at that number, I think I would be saying, and you may call me at this number, dah, dah, dah. So already we're deviating a little bit from express consent, but I understand the FCC has told us that express consent means if you give the phone number, that is express consent, at least for certain things. So this is basically following along Judge Gould's question, and as I'm reading the FCC order, hence, any telephone subscriber who releases his or her telephone number has, in effect, given prior express consent to be called by the entity to which the number was released, so that it seems to me a very easy proposition, for example, if he gives his phone number to Gould's gym in Wisconsin, he cancels after three days, five days after that, Gould's gym calls him and says, what did we do that made you unhappy? We'd love to have you as a customer. I think he's clearly given express consent to that phone call, even if it's a robocall. But by the entity, I think it has to mean something. Do you disagree? I don't disagree. So how is this entity the same as the entity to which he gave his phone number? Because the ownership was the same. How do you know that? I've just been told we don't know that that's the same. I know, and I'm going to tell you that I think the facts suggest otherwise. Well, wait a minute. You just said no, and now you said suggest. What do you mean? OK, this entity, this Gould's gym in Green Bay, Wisconsin, was owned by a series of interlocking owners in ownerships that never changed. That's why they had to debrand from Gould's gym. The label changed. The ownership did not. What's the state of the record with respect to ownership and so on? Because I just heard that there's a lot about this stuff that's a little, I guess I'll say imprecise or unknown. What's in the record in terms of what we know? Well, I will address the court in both the brief, both in my briefing to the court. You'll find the references to the record. Let me just give you that. At pages eight and nine of my meeting, vertical fitness brief, and you can find the same points made with different references to the appellate appendix and the record at pages six and seven in Avicor's brief. And I'll be happy to go through that with you. But ultimately, what Judge Burns, the conclusion he came to from reviewing all of the evidence that was in front of him was that this was the same, effectively the same entity. And if you look at the case law that has come out across the nation, and there's two circuit courts of appeal decisions that I think really influence this. And one is the Basden decision. That's out of the Sixth Circuit. And I think that's actually this year. I think that that court issued that decision in February, Your Honor, of 2006. I'm not so much interested in those cases. I'm trying to figure out an entity as it relates to this case and as to the reasonable expectation that the parties might have had when Mr. Van Patten gives his phone number. It doesn't strike me as very likely that Mr. Van Patten understood that he was giving his phone number that he could be called three years later by a, quote, rebranded Jim. I don't think that there is probably anything, Your Honor, with respect, if I, as an advocate in front of this Court, if I can have the temerity to disagree with you, I don't think that that's the standard. I think it's the standard. Well, how can it not be the standard if the touchstone is expressed consent? I mean, what did he consent to? Well And we're already moving away from it to an implied consent. I understand the FCC had already gotten you to that point. But at some point, this is beyond any reasonable expectation of someone who gives his phone number in Wisconsin. I simply, under the case law that has developed and under the way that the FCC has interpreted its own guidelines, its own regulations and this statute, and I can tell you, Your Honor, someone that practices in this area every day, I can tell you this is one of the few that the FCC has not liberalized its interpretation of what prior expressed consent means. Everything else, what is a automatic telephone dialing device, is now anything that is electronic. Whether there's vicarious liability has been expanded. Who has the burden of proof? But in this area, this is a term of art. Express, prior express consent, just like you can have an express contract that may be oral. It doesn't have to be written. I'm trying to understand though, given express consent in giving the phone number to Gold Gem or these type of communications, we might not have any quarrels with. But you're saying that that express consent also gives express consent to entities that are not within the four corners of the contract with Gold Gem? Correct. So if that's your position, which is clear, I think, from your briefings, in that context, I take it that if someone gives express consent, there should be some way to revoke express consent, correct? I do. I agree with that. And what opportunity does Mr. Van Patten have in this case to revoke? He could have called up after the first text message, for example. And that would have given us some evidence that he had revoked his consent. This is how I look at it, Your Honor. So revocation of express consent is the flip side of giving consent. If that sounds so simple, I apologize. But if he says, I revoked my contract, I don't want this contract, that's not enough? Well, yeah. I don't think it is enough. And I think all of the case law that I've cited in front of you from across the country doesn't find that that happens kind of by operation of law. It's not operation of law. There are two different transactions, if you get my point, if you understand what I'm saying. There are two different transactions. So you have a choice. I think you've got two opportunities. First of all, under the case law and under the FCC orders, at the time that you provide the number, which under the FCC rulings and interpretations, that is the expression of consent, at that point in time, you can limit how you want to be contacted or what you want to be contacted on. Again, that's in the orders. I'm not, it's not the law according to Mark Ellis. And then later on, you have the opportunity to revoke consent, or I think probably limit in some way. I think they both work together, if that makes sense, Your Honor. And here, neither one, there were no facts supporting either one. And that's why when we use, for example, the, I think it's Mata Sheeta, I'm sure I'm butchering the Supreme Court decision, that talks about kind of a metaphysical issue out there on summary judgment. I think that's why Judge Burns, and I think we all have to admit a very strong order. I mean, he wasn't, you know, you've cut substantially into your co-counsel's time, so you may want to speed up or sum up. Yeah, well, I'm going to, I'm going to stop then. Did I, did I, I tried to answer all of y'all's questions to the best of my ability. Thank you. Okay, thank you. In order to preserve peace among co-counsel, I'll put seven minutes on the clock. Okay, thank you, Your Honor. And you owe him big time. May it please the Court, Alex Pape, FDMU, for Defendant Anne DiPelli, Advocore. Now, it seems that most of the discourse thus far has focused on whether this was, in fact, the same gym and exactly the extent to which the prior express consent was provided. In fact, plaintiff in his argument stated that it would have been a normal business communication if the same gym had contacted the plaintiff. So, that's really the issue right here. And Your Honors asked for a citation to the record to support the fact that the gym ownership was the same. And so, I'd like to ask you this. Let's assume I go into a Ford dealership here in Pasadena. And I give them my phone number with respect to a used car I'm looking at. And then I buy something else. Man, I move on. I then get an email. I don't know. Do you guys call them blasts? I get some robocall to my phone from Ford National so-and-so giving me an advertisement for Ford inviting me to come into all Ford dealerships across the country. Is that the same entity? I don't know if it would. It would depend upon the specific structure. But as far as the TCPA is concerned, I think that it would be. And the reason why I say that is going back to the FCC orders which are binding upon the court, at least in this context since there's been no direct appeal. You know, you may be right. But I have to say it doesn't correspond with my intuitive sense of why I gave my phone number. I was looking at a used car at this dealership in Pasadena and I gave him the phone number so he could call me back. And then I get my phone loaded up with stuff from National Ford advertising, I don't know, F-150s. Well, Your Honor, I disagree with you on that point for the simple reason that when you went into that Ford dealership, you expressed an interest and a desire to receive communications regarding Ford vehicles. No, I looked at a very specific used car. I talked to the salesman and I said, here's my phone number. Give me a call about this car. Or impliedly, the only thing I was looking at was used cars. So I understand, Your Honor. I certainly did not say to him expressly, and I'd love to get anything that Ford ever wants to send me. Well, but the question really comes down to how broadly this prior express consent is going to be construed. Oh, that's right. Of course, that's right. And fortunately, we have guidance from the FCC on that. In 2015, the FCC issued an order. And the order from the FCC stated that anything that was, oh, I apologize, it was the Group Me order that stated that anything broadly regarding the transaction suffices to fall under the umbrella of the consent. So as long as it's broadly regarding that transaction, it doesn't have to be cut as razor thin as plaintiff tries to cut it. And what's the date of that order? I believe that one is, I believe it's 2012, but I'm not 100% sure. Okay, I got it. I'll find it. Yeah, it's in the table of authority. But it's anything broadly regarding. And then we have an opinion from the, I believe it's the Sixth Circuit. Let me check my notes. That states that Hudson v. Sharp Healthcare, sorry, that's not a circuit court. That's a district court. But it states that it has to have some relation to the product or service. So it's not narrowly cut. I think I might have been monopolizing and Judge Gould might have had a question. Well, let me ask a question that's related to Judge Fletcher's, but it's part of what's on my mind relates to the statutory interpretation of express prior consent. And what I'm wondering is, are issues relating to the scope of what one consents to? So to give an example, let's say a lawyer has a tire that's losing air. It's getting flat. And they drive into their local filling station that fixes tires or sells new ones. And they leave the tire and they give their phone number. They might get a call saying, okay, we can plug your tire or it can't be fixed. You know, we're going to try to sell you new replacement tires or you get them elsewhere. But they leave their phone number. Can the filling station then send text messages to that person who left their number about the flat tire, trying to sell them a whole bunch of other items? Justice Gould, I believe that the answer to that is found in the FCC orders. And in the 1992 order, it makes clear that when a cell phone number is provided in response to the request of another, of a business and not limited, that that constitutes prior express consent for normal business communications. And in this case, I'd like to point out a misstatement of the record that was made. And that misstatement is that the phone number was only provided in connection with this specific membership agreement. And that's simply not true. The undisputed evidence that's set forth in the briefs and in the excerpts of record is that Mr. Van Patten showed up at the gym and before there was any membership agreement put in front of him, before membership was even expressly discussed, before there was a tour, before all of that, he was requested to provide and provided his phone number. And so his consent at that point was a broad consent under the circumstances of this case. So he consented at that moment to information regarding the gym and regarding membership in the gym. Yeah, okay. Was he also informed that he has a right to limit those type of phone calls as a result of giving his phone number? He was not informed that he has a right to limit his phone calls, but the FCC has not required him to be informed of that right. And counsel made some reference to cases that have found that relevant. Maybe I'm wrong, but I got the impression from your cohort earlier that he has the right to give that limitation. Do you agree with that? He may provide a limitation, yes. And he wasn't given that opportunity here, so he then has an expectation under the law then to get any type of phone call, including lottery tickets? I disagree, Your Honor, that he was not given the opportunity. He could have limited his consent at that moment when he provided his phone number. He could have said, why am I providing my phone number? What are you going to do with my phone number? I don't want you to call me. But he didn't. He just handed over his phone number. And the cases are clear that societal norms are such that if you provide a business with your phone number in response to their request and you don't give them any limit as to how it can be used, that that's a broad consent to be contacted regarding, at the very minimum, and I think it's broader, but at the very minimum, regular business calls. All of us get these privacy notices concerning what a company can do with our information. Is there a requirement under the telephone, the federal act here, the TCPA? Not that I'm aware of, Your Honor. And if I may, I know I'm a little bit over time, so. Yeah, if you'd sum up. In sum, it seems like the dispositive issue here is whether the consent was given to this And I respectfully submit that, yes, it was. Well, no, that's not the issue. Of course it was given to this, Jim. The question is whether it's the same entity that's now calling him. Well, and again, I'd submit that the briefs show that it was. But even if it was not, this Court's opinion in Baird that just came down and the rulings of the FCC show that as long as there's a relationship, a contractual relationship between the calling party and the party to whom the consent was given, that the consent can be given through and transferred through an intermediary. And the undisputed evidence here is that Vertical at all times was the operator and the manager of this gym. And there is no evidence in the record whatsoever. Of this gym. I understand that this gym doesn't exist anymore. Is that right? This physical gym. Based upon the evidence, it did not exist in 2014. There is absolutely no evidence that this gym did not exist in its current location in 2012 when the text messages were sent. So the evidence is incompetent. Okay, thank you, Your Honor. Wait, Judge Fletcher, I'd like to get counsel's insight on another question. Apart from the question whether the gym is the same entity, it seems to me there still is a different issue on what is the scope of the consent. And what I'd like to know is what are the strongest cases on your side of the case that force reliance on the FCC opinion as opposed to when we could chart a different course interpreting the statute? Thank you for that question, Your Honor. I believe that the court's opinion in Murphy, I believe it's the 11th Circuit's opinion in his contact information when donating blood in a prequalification card, just like here, and donated his blood and went home, and then a number of years later got a text message inviting him to come back, and he sued. And the court expressly discussed the fact that the FCC orders are binding under the Hobbs Act unless the United States has been joined in a direct appeal from that FCC order upon which interpretation is relied. So that would be the first case. And the second case I believe comes from this court. Please let me check my notes for one second. Yes, Baird v. Saber in this court, it's star two to star three, basically discusses the same point. I'm sorry. Could you give me that case name one more time? Baird v. Saber.  Okay. It was mentioned in vertical supplemental authorities, I believe. Reinforces the fact that the FCC's opinions and interpretations are what governs absent a direct appeal from the FCC order in which the United States is joined and has an opportunity to present its case as to why its interpretation was correct. Because the FCC is given broad discretion. It has far superior knowledge of the statutes and the policies at play. And so deference is properly given to their interpretations and orders. And when you refer to Baird v. Saber, you're talking about the district court opinion from Judge Wilson? I'm talking about the opinion of this court. I believe Judge Wilson discussed it as well, but I don't have that in my notes. I do have in my notes Ninth Circuit 2016 opinion. It's point one. Okay. I've got in front of me the district court, but we may have affirmed it. Okay. Well, have a look. All right. Thank you. Can I volunteer to cite some court opinions? If you have the citation for our opinion, that'd be great. I do. It's Baird v. Saber 2016, final, February 3rd, 2016. 2016, Westlaw, 4-2-4-7-7-8. Ninth Circuit, February 3rd, 2016. Correct. And the panel there was Judges Nelson, Callahan, and Smith. I have the Lexus side as well. I don't know what you prefer. Okay. I got it. Yeah, I'm sure my very capable law clerks are totally on top of this one. Okay. Thank you very much. Thank you. Thank you. Response? To borrow your analogy, Your Honor, you talked about whether you went to a local Ford dealership and then the national Ford company contacted you. If I could borrow upon that, I think this case is analogous to if you went to a Ford dealership and three years later, a Chevy dealership contacted you. Because Gold's Gym was the original brand and then a new different concept brand contacted you three years later. Yeah, but as far as I'm aware, GM and Ford are totally different companies. Correct. And are these totally different companies? Sounds as though there's an awful lot of overlap in ownership. Well, there is overlap in ownership, Your Honor, but the burden is on the moving parties to demonstrate that it's the same entity. And Mr. Barton's deposition testimony in the record shows that Fox River owned that Green Bay Gym, not Vertical Fitness. Vertical Fitness sent the letter. Whether there's a myriad of LLCs owning different entities, that's not in the record. And that inference shouldn't have been drawn by the district court in favor of the moving parties. Okay. I got the point. The Bard case or Baird case is also distinguishable because an individual gave a telephone number to Hawaiian Airlines and then received promotional text messages regarding Hawaiian Airlines shortly thereafter. This case is much more in line with the Ninth Circuit decision in Satterfield where a different entity provided, the individual gave consent to receive Nextone applications on their phone and then subsequently was contacted by a separate company. And again, in light of the motions for summary judgment, I just think that the standard and the burden is on the moving parties to demonstrate that. And since the issue of prior expressed consent is one of an affirmative defense, the burden is on the moving parties to establish that. And here, they don't have any evidence in the record to suggest that Vertical Fitness ever obtained the telephone number of Mr. Van Patten. Aside from prior applications to a Gold's Gym. So unless there's any other questions. Okay. Thank you very much. None here. Thank you. Okay. Thank both sides for their arguments. We will now take a short break. Thank you. All rise.
judges: W. Fletcher, Gould, Lemelle